# United States Court of Appeals
## For the Eighth Circuit

_____

No. 14-3601

_____

Frederic Fezard; Lisa Fezard, Individually and on behalf of all others similarly situated

*Plaintiffs - Appellants*

v.

United Cerebral Palsy of Central Arkansas, doing business as United Cerebral Palsy of Arkansas

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Little Rock

_____

Submitted: September 23, 2015
Filed: January 5, 2016

_____

Before MURPHY, MELLOY, and SMITH, Circuit Judges.

_____

SMITH, Circuit Judge.

This case requires us to construe the phrase "private home" in a regulatory provision of the Fair Labor Standards Act (FLSA). The relevant provision exempts employers from paying overtime wages to domestic service employees who provide companionship services in a "private home." 29 U.S.C. § 213(a)(15); 29 C.F.R. § 552.3 (2014). The employees in this case provide services on behalf of

their employer, United Cerebral Palsy of Central Arkansas (UCP), to people who reside in the employees' private residences. The employees, led by Lisa and Frederic Fezard, filed this suit seeking overtime pay from UCP, contending that the living arrangement requires additional work time that should be compensated as overtime. Ms. Fezard has also claimed that UCP terminated her in retaliation for filing a complaint with the Department of Labor (DOL). The district court[1] granted summary judgment to UCP, concluding that the homes in which the employees provided services were "private homes" under the FLSA and that Ms. Fezard failed to establish pretext in response to the legitimate, nonretaliatory reasons that UCP provided for her termination. We affirm.

## I. *Background*

UCP is a nonprofit organization that provides services to disabled persons. UCP employees provide companionship services to UCP's clients at each client's place of residence. But instead of living on their own or with family members, the clients in this case live with the UCP employees who provide their care. The employees have opened their homes and invited their clients to live as roommates or surrogate family members.

UCP has not dictated that its employees and clients live together. It does not mandate that clients move into its employees' homes when they become a UCP client. It does not require them to move out when they stop receiving UCP services. And it does not control the details of the living arrangement, such as how much rent a client must pay to live with the employee. Instead, the living arrangements are between the client and the employee acting as an independent third party—a relationship over which UCP has exerted no control.

---

[1]The Honorable James M. Moody Jr., United States District Judge for the Eastern District of Arkansas.

Pursuant to the domestic-service-employment exception of the FLSA, 29 U.S.C. § 213(a)(15), UCP pays the employees a flat daily rate without overtime. On March 5, 2012, Ms. Fezard sent an e-mail to UCP demanding that UCP increase her daily rate from $160 to $200. On March 9, UCP paid her the $160 rate. On March 12, Ms. Fezard told UCP that she had filed a complaint with the DOL. UCP terminated her on March 15. Unknown to UCP, Ms. Fezard had not actually filed the complaint.

Prior to her termination, Ms. Fezard experienced other problems with UCP. Three months before her termination, she wrote a "very hostile and accusatory" e-mail. In a discussion with UCP's CEO about the e-mail, she told him, "I have no respect for anybody here at UCP." UCP considered terminating her at that time on the basis of her insubordination but it decided to continue her employment because her stepson was a UCP client. Then on February 23, 2012, just weeks before her termination, a state inspector conducted a home visit for one of Ms. Fezard's clients; the home inspection revealed numerous performance deficiencies and concerns for the client's welfare. UCP asserts that it terminated Ms. Fezard on the basis of her insubordination and deficient performance, not her alleged complaint to the DOL.

The Fezards filed this collective action, seeking certification of an opt-in class of UCP employees. The district court certified the class, and ten other employees joined the litigation. As a class, the employees sought overtime pay under the FLSA and the Arkansas Minimum Wage Act. Ms. Fezard also alleges that UCP wrongfully terminated her in retaliation for filing a complaint with the DOL. The district court granted summary judgment to UCP on all claims. The employees appeal. We have jurisdiction to review the final judgment of the district court pursuant to 28 U.S.C. § 1291.

## II. *Discussion*

The employees challenge the district court's summary judgment on appeal, arguing that they did not provide services in a "private home" under the FLSA. And

Ms. Fezard argues that she has satisfied a prima facie claim for employment retaliation and therefore that the district court's summary judgment was improper. "We review de novo a grant of summary judgment, considering the facts in the light most favorable to the nonmoving party. Summary judgment is proper when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law." *Neb. Beef, Ltd. v. Wells Fargo Bus. Credit, Inc.*, 470 F.3d 1249, 1251 (8th Cir. 2006) (quotation and citation omitted).

## A. *A "Private Home" Under the FLSA*

The district court granted summary judgment to UCP, citing the factors set forth by the Tenth Circuit in *Welding v. Bios Corp.*, 353 F.3d 1214 (10th Cir. 2004). Applying the *Welding* factors, the district court concluded that the employees provided services in residences that were "private homes" within the context of the FLSA. The district court reasoned that UCP lacked control over the living arrangements and was not responsible for the additional hours of labor occasioned by the shared living space with clients. On appeal the employees assert that the court erred in applying the *Welding* factors. Specifically, they argue that the clients had less control over the residences than the employees; consequently, the residences could not be private homes. We decline to adopt the *Welding* factors in this case but nonetheless agree with the thrust of the district court's reasoning.

The FLSA requires employers to pay overtime compensation. 29 U.S.C. § 207. But the Act exempts

> any employee employed in *domestic service employment* to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves (as such terms are defined and delimited by regulations of the Secretary).

*Id.* § 213(a)(15) (emphasis added). At the time in question, the associated regulations defined the phrase "domestic service employment" as

> services of a household nature performed by an employee in or about a *private home* (permanent or temporary) of the person by whom he or she is employed. The term includes employees such as cooks, waiters, butlers, valets, maids, housekeepers, governesses, nurses, janitors, laundresses, caretakers, handymen, gardeners, footmen, grooms, and chauffeurs of automobiles for family use.

29 C.F.R. § 552.3 (2014) (emphasis added).[2] Section 552.101 further clarifies this definition, directing that the physical form of the residence does not determine whether it can be a private home. That section notes that "[a] separate and distinct dwelling maintained by an individual or a family in an apartment house, condominium or hotel may constitute a private home," *id.* § 552.101(a), even though they are commercial in form and operation. In contrast, those who happen to work in structures that look like private homes, but are "primarily rooming or boarding houses are not considered domestic service employees." *Id.* § 552.101(b). The same is true for "employees employed in connection with a business or professional service which is conducted in a home (such as a real estate, doctor's, dentist's or lawyer's office)." *Id.*

We have not previously construed the term "private home" in § 552.3. But as a general matter, we have held that exemptions to the FLSA are "narrowly construed in order to further Congress' goal of providing broad federal employment protection." *Spinden v. GS Roofing Products Co.*, 94 F.3d 421, 426 (8th Cir. 1996) (quotation and

---

[2]The regulations in this area have changed substantially, eliminating the third-party employer provision by which UCP was able to take advantage of the domestic-service-employment exception. *See Home Care Ass'n of Am. v. Weil*, 799 F.3d 1084, 1089 (D.C. Cir. 2015). Nevertheless, we apply the regulations applicable during the time period relevant to this case.

citation omitted). UCP bears the burden of "prov[ing] that this exemption applies by demonstrating that [its] employees fit plainly and unmistakably within the exemption's terms and spirit." *Id.* (quotation, alterations, and citation omitted).

In *Welding*, the Tenth Circuit set forth six factors for determining whether a dwelling is a private home under the FLSA regulations. 353 F.3d at 1219–20. These include (1) "whether the client lived in the living unit as his or her private home before beginning to receive the services"; (2) "who owns the living unit," which may include a leasehold interest; (3) "who manages and maintains the residence"; (4) "whether the client would be allowed to live in the unit if the client were not contracting with the provider for services"; (5) "the relative difference in the cost/value of the services provided and the total cost of maintaining the living unit (including government subsidies)"; and (6) "whether the service provider uses any part of the residence for the provider's own business purposes." *Id.* Other courts have formulated additional factors, including

> whether significant public funding is involved; who determines who lives together in the home; whether residents live together for treatment purposes as part of an overall care program; the number of residents; whether the clients can come and go freely; whether the employer or the client acquires the furniture; who has access to the home; and whether the provider is a for profit or not for profit entity.

Application of the Fair Labor Standards Act to Domestic Service, 78 Fed. Reg. 60462 (citing *Johnston v. Volunteers of Am., Inc.*, 213 F.3d 559 (10th Cir. 2000); *Linn v. Developmental Servs. of Tulsa, Inc.*, 891 F. Supp. 574 (N.D. Okla. 1995); *Lott v. Rigby*, 746 F. Supp. 1084 (N.D. Ga. 1990)).

The factors employed in prior cases are somewhat helpful; but they fall short because of factual distinctions present here. In prior cases, the relevant comparison was between the employer and the client—the employer's commercial care facility or

the client's traditional single-family residence. *See Welding*, 353 F.3d at 1218; *Johnston*, 213 F.3d at 562–63; *Linn*, 891 F. Supp. at 578–79; *Lott*, 746 F. Supp. at 1085. But the dwelling units in this case involve the employee acting as an independent third party.

Nevertheless, the discussion of "private home" in prior cases has revolved around this question: Does the employer own or control the home? *See Welding,* 353 F.3d at 1219 (holding that "the key inquiries are who has ultimate management control of the living unit and whether the living unit is maintained primarily to facilitate the provision of assistive services"); *see also* 29 C.F.R. § 552.101(a) (2014) (providing that a hotel or apartment can be a private home). In other words, if the client chooses to live in a dwelling controlled primarily by the employer, the dwelling probably is not the client's private home. If the client maintains control—or has delegated control to a third party—it probably is a private home. All of the clients in this case chose a living arrangement subject to some measure of control by a third-party who also happens to work for UCP. From an employer's perspective—the relevant perspective for purposes of the FLSA—it is irrelevant whether a client maintains a dwelling unit or pays a landlord to do so. In either case, the employer is providing companionship services for the client in a private home. Although the district court's analysis of the dwelling units used different terminology, it was certainly focused on employer control of the living arrangement.

In this case, every client lived in a dwelling that was private in relation to UCP. UCP did not exert control over the room in which a client lived, the rent paid, or any other term or condition of the living arrangement. UCP did not require a client to live in a specific dwelling unit in order to receive services. Further, while UCP may have acted to facilitate a connection between a client and the caregiver, UCP's involvement was limited to making the connection. Finally, UCP had no ability to evict any client if the client ceased to use UCP's services.

Additionally, many of the clients in this case paid rent. The rental agreements ranged from a written, long-term lease to an informal at-will tenancy, with some clients paying several hundred dollars each month. Moreover, many of the clients rented a specific room—or even a separate building—that constituted an identifiable dwelling unit within the property as a whole. Such arrangements render the clients tenants, or subtenants, and confer upon them a legally significant interest in the dwelling unit—even if that unit constitutes only a part of a traditional single-family residence.

In sum, the district court correctly granted summary judgment to UCP, concluding that the dwelling units in which the employees provided services were private homes.

## B. *Employment Retaliation*

The district court granted summary judgment to UCP because Ms. Fezard did not provide evidence that she filed her claim with the DOL before she was terminated and because she did not establish that the legitimate, nonretaliatory reasons that UCP provided for her termination were pretextual. Ms. Fezard successfully challenges the timing of her DOL claim, but she has not rebutted the legitimate, nonretaliatory basis for her termination. Accordingly, we affirm.

Ms. Fezard's employment-retaliation claim is evaluated under the *McDonnell Douglas* burden-shifting framework. *See Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 832 (8th Cir. 2002) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973)). Under this framework, she must establish a prima facie claim of retaliation to survive summary judgment by providing evidence from which a jury could conclude that (1) she engaged in a protected activity, (2) she suffered an adverse employment action, and (3) a causal connection exists between her protected activity and the adverse employment action. *Id.* But if UCP comes forward with

evidence of a legitimate, nonretaliatory basis for the adverse employment action, she must then point to some evidence that UCP's asserted basis is pretextual. *Id.* at 833.

The district court found that Ms. Fezard failed to establish that she engaged in a protected activity. The court noted that Ms. Fezard did not file a report with the DOL until after UCP terminated her. But the district court also found that on March 12, 2012, before her termination, Ms. Fezard told UCP employees that she had filed a DOL complaint. In *Saffels v. Rice*, 40 F.3d 1546 (8th Cir. 1994), we addressed "[t]he sole question . . . [of] whether § 15(a)(3) of the FLSA protects employees who are terminated from their employment based on their employer's mistaken belief that they reported violations of the law to the authorities or otherwise engaged in protected activity." *Id.* at 1548. We held that the FLSA protects an employee when an employer mistakenly believes that she has engaged in a protected activity. *Id.* at 1549. Accordingly, we conclude that Ms. Fezard satisfied the protected-activity element of a prima face case for retaliatory termination because UCP could well have believed that she had filed the DOL complaint based on her March 12, 2012 statement. And because UCP terminated her just three days later, she also satisfied the adverse-employment-action and causal-connection elements of the prima facie case. *See Smith*, 302 F.3d at 833.

The prima facie analysis, however, does not end the inquiry. The district court concluded that UCP had provided evidence of a legitimate, nonretalitory basis for terminating Ms. Fezard. In particular, the district court recited several instances of unprofessional and insubordinate communication from Ms. Fezard; a significant, unfavorable performance report from a state inspector who conducted a home visit for one of Ms. Fezard's clients; and written evidence that UCP was considering her termination before she told them about the DOL report. In short, Ms. Fezard was not performing and was creating significant unrest within the organization. Ms. Fezard argues that the bases asserted by UCP are pretextual, pointing to the close proximity of her notice to UCP of her DOL claim and her termination. Although we have held

that timing may be sufficient to make out a prima facie case, it is not enough to undermine a preexisting, nonretaliatory basis for the termination. *Id.* at 834. Here, Ms. Fezard fails to put forth evidence beyond temporal proximity to show that a material fact dispute remains as to her termination.

The district court correctly granted summary judgment to UCP because Ms. Fezard failed to provide evidence from which a jury could conclude that the nonretaliatory bases for termination asserted by UCP are pretextual.

## III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____